UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW J. MAXWELL, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 03 C 3524 |
| v. | ) ) | Judge Joan B. Gottschall |
| KPMG, LLP, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On March 1, 2000, Whittman-Hart, Inc. ("Whittman-Hart"), an information technology consulting company, and USWeb/CKS Corporation ("USWeb"), an internet professional services firm, merged to form marchFIRST, Inc. ("marchFIRST"), an information technology consulting company. After the merger, the technology bubble burst and marchFIRST filed for bankruptcy just one year later, on April 12, 2001. Andrew J. Maxwell, the Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc. (the "Trustee"), has sued KPMG LLP ("KPMG"), Whittman-Hart's independent auditor. Specifically, the Trustee alleges that KPMG breached its professional responsibilities by failing to inform Whittman-Hart's board of directors, its audit committee, and others, that its 1999 net income and fourth quarter results were overstated in an unaudited Earnings Release prior to the closing of the merger. The Trustee claims that absent these breaches, marchFIRST would either have avoided insolvency altogether or would not have become as deeply insolvent as it is now because had USWeb known about this overstatement, it would have backed out of the merger. Had the merger not

1

gone through, Whittman-Hart—unburdened by USWeb—would have survived the technology crash. Therefore, the Trustee seeks to hold KPMG liable for not saving Whittman-Hart from the disastrous consequences of the Whittman-Hart/USWeb merger.

KPMG has moved for summary judgment. For the reasons stated below, KPMG's motion is granted.

**I. BACKGROUND**

Whittman-Hart was engaged in the business of providing information technology ("IT") consulting services primarily to middle-market and Fortune 500 companies. Those services included, among other things, systems integration, strategic planning, business process improvement, and design and electronic commerce solutions. In the late 1990's, more than half of Whittman-Hart's clients were demanding digital communications and/or Internet expertise. As part of a five-year strategic plan to expand its range of IT services and its geographic presence, Whittman-Hart sought acquisition opportunities or potential merger partners to increase its size and competitive position, and to gain access to the Internet and e-commerce sectors. During 1998 and 1999, Whittman-Hart acquired a number of IT consulting companies such as Four Points Digital, L.L.C., a company that had digital communications and Internet expertise. In the fall of 1999, Whittman-Hart identified USWeb as a potential merger candidate. The merger came together quickly and was "enthusiastically endorsed" by Whittman-Hart's management. Compl. ¶¶ 11-12.

On November 21, Whittman-Hart retained KPMG to perform an audit of its consolidated financial statements for the year ended December 31, 1999.

On December 12, 1999, the Whittman-Hart Board unanimously adopted resolutions approving the Merger Agreement and authorizing its corporate officers to execute, deliver and perform the Merger Agreement. Whittman-Hart subsequently entered into a written Agreement and Plan of Merger with USWeb (the "Merger Agreement"). According to the terms of the Merger Agreement, the merger was a stock-for-stock exchange. The stockholders of USWeb received .865 shares of Whittman-Hart for each share of USWeb common stock. After the merger, Whittman-Hart would be the surviving corporation.

On or about January 13, 2000, Whittman-Hart filed its Form S-4 Registration Statement, including a joint proxy statement, with the Securities and Exchange Commission ("SEC"). One of the purposes of this filing was to register the shares of common stock to be issued in connection with the Merger Agreement. The S-4 Statement announced "the signing of a definitive agreement to merge" with USWeb, touting the anticipated strategic benefits of the merger. The S-4 Statement also included extensive risk disclosures, such as: (1) "The market for Internet professional services is relatively new, intensely competitive, rapidly evolving and subject to rapid technological change"; (2) "If the market for such services does not continue to develop or develops more slowly than expected, or if the combined company's services do not achieve market acceptance, its business will be negatively affected"; and (3) "[A] significant shortfall in demand for services could have an immediate and a significant negative effect on the combined company's business and results of operations." Ex. 18 to Def.'s Statement of Facts (Form S-4).

The stock market reacted negatively to the proposed merger. On the day it was announced, Whittman-Hart's stock price fell 31% and USWeb's stock price fell 14%. Despite this reaction, Whittman-Hart and USWeb pressed on to complete the merger. On January 21, 2000, KPMG met with Whittman-Hart's audit committee and reported on the status of its work auditing the company's 1999 financial statements, stating that it expected to substantially complete its fieldwork by January 24, 2000.

On January 24, 2000, Whittman-Hart issued an unaudited earnings release reporting its earnings for the fourth quarter of 1999, and the year ended December 31, 1999 ("1999 Earnings Release"). According to this earnings release, Whittman-Hart reported revenues of $133 million and net income of $8.4 million. For the year ended December 31, 1999, Whittman-Hart reported revenues of $480.9 million and net income of $30.3 million. The financial statements attached to the 1999 Earnings Release were identified as "unaudited." On January 26, Whittman-Hart filed a Form 8-K ("January 26 8-K") with the SEC, attaching a copy of the text of the 1999 Earnings Release. The January 26 8-K did not contain the unaudited Balance Sheet or the unaudited Income Statement from the 1999 Earnings Release.

On January 27, 2000, Whittman-Hart filed an amendment to its Form S-4 Statement related to the merger. Though KPMG consented to the use of Whittman-Hart's 1998 Financial Statements and its Audit Report for 1998 in connection with the S-4 Filings, KPMG did not consent to the use of any audit report on Whittman-Hart's 1999 Financial Statements in connection with the S-4 Filings.

On February 28, 2000, the shareholders of Whittman-Hart and USWeb voted to approve the merger. Following the meeting at which the merger was approved, KPMG

4

met with Whittman-Hart's audit committee to present the results of the 1999 audit. KPMG informed the committee it expected to deliver an unqualified audit report. The merger closed on March 1, 2000, and Whittman-Hart subsequently changed its name to marchFIRST.

There is no statement by KPMG associated with the financial information contained in the unaudited 1999 Earnings Release. Indeed, KPMG did not issue its audit report on Whittman-Hart's 1999 financial statements until March 27, 2000, well after the merger had closed. Further, Whittman-Hart did not file its Form 10-K for the period ended December 31, 1999, until March 30, 2000.

Following the merger, the technology market underwent a major economic crisis, often referred to as the bursting of the technology bubble. In the third quarter of 2000, marchFIRST announced earnings that badly missed analysts' expectations. The company's fortunes thereafter declined at a rapid rate, and on February 12, 2001, it announced a $6.8 billion loss for the year 2000. On April 12, 2001, marchFIRST filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. On or about July 16, 2001, Andrew J. Maxwell was appointed as the Chapter 7 Trustee for the bankruptcy estates of marchFIRST.

The Trustee has brought claims for professional malpractice and breach of contract against KPMG, alleging that the 1999 Earnings Release and the January 26 8-K overstated Whittman-Hart's revenues. The Trustee admits that there is no statement by KPMG associated with the financial information contained in the 1999 Earnings Release. However, KPMG did review the 1999 Earnings Release. KPMG admits—solely for the purposes of this motion—that Whittman-Hart would not have issued the Earnings

Release if KPMG had not approved of the financial numbers contained therein. The Trustee contends that because KPMG either knew or should have known that there was a problem with the 1999 Earnings Release and the January 26 8-K, it should have insisted that Whittman-Hart issue and file correct financial information. Interestingly, the Trustee claims that while this allegedly correct information "would still show that Whittman-Hart was a successful company," it would "also show that Whittman-Hart was not growing rapidly through expanding internet services." Pl.'s Opp. 1. This, according to the Trustee, would have been enough to make USWeb back out of the merger. Had USWeb—a company that is much larger than Whittman-Hart—done so, then Whittman-Hart would not have "been burdened by the problems involved in attempting to integrate and manage a company more than twice its size," and the stand-alone Whittman-Hart would have been able to survive and succeed. Pl.'s Opp. 1-2.

The Trustee is suing KPMG for the difference between the value of a hypothetical stand-alone Whittman-Hart on April 12, 2001, and the purported negative value of marchFIRST on April 12, 2001, on the ground that had KPMG pointed out the problems with the 1999 Earnings Release, the merger would not have happened.[1]

---

[1] The Trustee's damages expert calculates damages as follows. Maxwell, as Trustee, offers the value of marchFIRST on April 12, 2001 (the date of bankruptcy), based on his estimates of what the liabilities and assets of the company were on that date. Maxwell asserts that the fair value of the debtors' business on the date of bankruptcy was negative $93.6 million. Marcus, the Trustee's damages expert, offers two figures. First, he estimates the value of Whittman-Hart's stock on the day before the merger ("February 29, 2000 valuation") had the accounting malpractice not occurred. Based on this value, he created a peer group stock index, using eight comparable companies, to estimate the value of Whittman-Hart had it not merged with USWeb and continued instead as a stand alone company ("April 12, 2001 valuation"). Marcus's index shows that comparable companies declined 70% in stock value over the observed time. Thus, he concludes that the stock market value of a hypothetical stand alone Whittman-Hart on April 12, 2001, (the date of bankruptcy) would have been $535 million. The total damages in this case are estimated to be the difference between this number and negative $93.6 million, the number that Maxwell opines is the value of marchFIRST on April 12, 2001. This leaves KPMG responsible for the $628.6 million difference that was caused by the merger. *See* Pl.'s Opp. to Motion to Exclude Opinion Testimony of Marcus, Maxwell.

## II. ANALYSIS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists only where the potential evidence would permit a reasonable finder of fact to return a verdict for the nonmoving party. *Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 960 (7th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006) (citing *Anderson*, 477 U.S. at 255).

"The elements of a professional negligence cause of action are: (1) the existence of a professional relationship, (2) a breach of duty arising from that relationship, (3) causation, and (4) damages." *MC Baldwin Financial Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006) (citing *Belden v. Emmerman,* 560 N.E.2d 1180, 1181 (Ill. 1990)).[2]

Under Illinois law, "a finding of 'but for' causation (what philosophers call a 'necessary condition') is not a sufficient basis for imposing legal liability." *Movitz v.*

---

[2] Accounting malpractice, like legal malpractice, can be styled as a tort claim or a contract claim. Under either theory, the plaintiff must prove proximate causation. *See Cleveland v. Rotman*, 297 F.3d 569, 572 (7th Cir. 2002) ("Under either a tort or contract theory, the elements of a legal malpractice claim are (1) an attorney-client relationship establishing a duty on the attorney's part, (2) breach of that duty, (3) proximate cause establishing that but for the breach the plaintiff would not have been injured, and (4) resulting damages.")

*First Nat. Bank of Chicago*, 148 F.3d 760, 762 (7th Cir. 1998). "[P]laintiffs must prove that a defendant's actions proximately caused their injuries before they can recover in tort, even in instances of intentional torts where fiduciaries are involved." *Martin v. Heinold Commodities, Inc.,* 643 N.E.2d 734, 747 (1994). Proximate causation, which is also referred to as loss causation[3] in the securities context, is especially helpful in cases that involve natural or financial disasters such as market collapses. *See Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (loss causation "attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame"). Although proximate cause generally is a fact question, *see Kavales v. City of Berwyn,* 712 N.E.2d 842 (Ill. 1999)), it "may be determined as a matter of law when the facts not only are undisputed but allow no difference in the judgment of reasonable men as to the inferences to be drawn therefrom." *See Prodromos v. Everen Securities, Inc.*, 793 N.E.2d 151, 159 (Ill. App. Ct., 2003) (citing *Seef v. Ingalls Memorial Hospital,* 724 N.E.2d 115 (Ill. 1999)).

"A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause."

---

[3] "Loss causation" is "the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990). Courts have used variations of this principle to cut off liability when, though the plaintiff may be able to demonstrate "but-for" causation, he cannot demonstrate proximate causation. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiff in a 10b-5 action must prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss); *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (common law fraud); *Movitz v. First Nat. Bank of Chicago*, 148 F.3d 760, 764 (7th Cir. 1998) (breach of contract and fiduciary duty in real estate case). Though the distinction between but-for causation and legal causation for a plaintiff's loss is particularly well developed in securities cases, where it is known as the distinction between "transaction causation" and "loss causation," the idea of loss causation is not limited to securities fraud. *See Movitz*, 148 F.3d at 763 ("The requirement of proving loss causation is a general requirement of tort law."); *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 747 (Ill. 1994) (adopting the principle of loss causation as analogous to the idea that "damages must be a proximate, and not remote, consequence of the [wrongful act]" (internal quotation marks omitted)).

8

*Cleveland v. Rotman*, 297 F.3d 569, 573 (7th Cir. 2002) (citing *Kleen v. Homak Mfg. Co.*, 749 N.E.2d 26 (Ill. App. Ct. 2001)). In order to prove proximate causation, the Trustee must offer evidence demonstrating that KPMG's alleged negligence caused Whittman-Hart's losses. This goes beyond simply proving "but for" causation because an accountant cannot be held liable for losses if subsequent events over which the accountant had no control—such as the plaintiff's bad luck or poor management decisions—caused the losses. *See Ryan v. Wersi Elec. GmbH and Co.*, 59 F.3d 52, 54 (7th Cir. 1995) (affirming summary judgment on loss causation grounds when plaintiffs "at best, made a showing sufficient to establish that [defendant's] false promises and misrepresentations were 'the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one.'" (quoting *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 684 (7th Cir. 1990)). As the Seventh Circuit recently noted in a fraudulent misrepresentation case, "It is not sufficient for an investor to allege only that it would not have invested but for the fraud. . . . [I]t is also necessary to allege that, but for the circumstances that the fraud concealed, the investment would not have lost its value." *Ray*, 482 F.3d at 995 (internal quotation marks omitted). In other words, the Trustee must offer evidence that shows a causal connection between KPMG's alleged negligence and Whittman-Hart's damages.

The Trustee must also prove that those losses were a foreseeable consequence of the violation of KMPG's legal duty. *See Cleveland*, 297 F.3d at 573 ("Legal cause exists where the injury was of a type that a reasonable person would foresee as a likely result of his or her conduct."); *Movitz*, 148 F.3d at 763; Restatement (Second) of Torts § 548A, Comment b (Legal causation is present only if the plaintiff's pecuniary loss is the

foreseeable result of the matters misrepresented by the defendant.) In *Movitz*, a real estate investor relied on a bank's evaluation regarding a building's structural soundness prior to his purchase of the building. *Id.* at 761. After the purchase "turned out to be a disaster," and the real estate market took a plunge, the investor sued the bank. *Id.* at 762. The Seventh Circuit held that while the element of "but for" causation was met—had the bank been more careful and discovered the structural problems with the building, the deal might not have gone through—proximate causation was not. Importantly, the Seventh Circuit reasoned, "The care that the bank was contractually required to take in advising [the investor] with regard to the purchase of the office building was not intended to prophesy or avert market fluctuations but to make sure that the building was a sound purchase under current market conditions." *Id.* at 763.

Here, assuming without deciding that KPMG did in fact breach a duty to Whittman-Hart in connection with its review of the 1999 Earnings Report, the Trustee is not entitled to try this case before a jury because he is unable to prove proximate causation. The Trustee's theory is that but for KPMG's failure to raise a red flag regarding the 1999 Earnings Report, USWeb would have backed out of the merger with Whittman-Hart in 2000. But for this merger, the combined company would not have gone bankrupt in 2001. Because Whittman-Hart's business and entire worth were destroyed as a result of the merger, and because the merger would not have occurred if KPMG had not committed malpractice, the Trustee seeks to hold KPMG liable for the company's losses due to the merger. The Trustee's theory is too attenuated.

First, the Trustee's argument that KPMG's alleged malpractice caused Whittman-Hart's demise is belied by his own admissions that the cause of Whittman-Hart's failure

10

was the bursting of the internet bubble and the fact that the merger partner, USWeb, was "a larger [technology] company." *See* Pl.'s Opp. 1-2 ("Had [Whittman-Hart] not been burdened by the problems involved in attempting to integrate and manage a company more than twice its size, a non-merged, stand-alone Whittman-Hart would have been able to survive and succeed."); *id.* 45-46 ("KPMG was a substantial factor in bringing about the merger which exposed Whittman-Hart to market forces that it otherwise would not have to endure in such a weakened condition."); *id.* 50 ("The destruction of Whittman-Hart's business and entire worth were in fact the result of the merger."). The Trustee himself admits that marchFIRST went bankrupt because of the effect market forces had on an unstable merger. Even if the Trustee could somehow prove that KPMG's failure to raise a red flag regarding the 1999 Earnings Report "caused" the merger, the Trustee cannot show that KPMG caused the merger *to fail*. *See Ryan*, 59 F.3d at 54 (affirming summary judgment on loss causation grounds in Illinois Consumer Fraud Act claim when plaintiff failed to show that his business losses were caused by the defendant's misrepresentations, "as opposed to a general downturn in the market . . . or simple cash flow mismanagement"). Without a causal connection between KPMG's alleged negligence and the Trustee's damages, there is not enough to warrant a reasonable jury in finding that, had KPMG acted with due care, Whittman-Hart would not have gone bankrupt.[4]

Second, the Trustee has failed to demonstrate that KPMG should have foreseen that USWeb would be a poor merger partner for Whittman-Hart or that the technology

---

[4] The Trustee counters this point by arguing that his damages theory "very carefully attempts to segregate out those losses that Whittman-Hart would have incurred had there been no malpractice (and hence no merger)," thus excluding from the damages he seeks the effect market forces would have had on Whittman-Hart had there been no merger. Pl.'s Opp. 51. This does not resolve the fundamental flaw with the theory, however, which is that the Trustee is unable to prove that KPMG's actions caused the merger to fail.

11

market would undergo a major upheaval. There is no evidence that KPMG ever advised Whittman-Hart as to the wisdom or the risk of the merger with USWeb. Thus, even if KPMG knew that the 1999 Earnings Report painted a rosier picture of Whittman-Hart's growth than was merited, it should not have anticipated that its failure to raise a red flag would lead to Whittman-Hart's demise because USWeb would prove to be a poor merger choice for Whittman-Hart, the technology market would undergo "a major economic crisis" and USWeb would be particularly susceptible to this market fluctuation.[5] *AUSA Life Ins. Co. v. Ernst & Young*, 119 F.Supp.2d 394, 405 (S.D.N.Y. 2000) (proximate cause of plaintiffs' loss was corporation's catastrophic decision to acquire a near-bankrupt retailer and other post-audit developments that could not have been anticipated by accountants); *see generally Movitz*, 148 F.3d at 764 ("To hold the defendant liable for [a loss that was not the kind that the defendant's disclosure requirement was intended to prevent] would produce overdeterrence by making him an insurer against conditions outside his control.").

The events that caused Whittman-Hart's demise were all unforeseeable post-audit events, including, most notably, a major market crisis and a bad merger choice. To hold KPMG liable in this case would make it an insurer against conditions that are outside of its control. Because the Trustee is unable to prove proximate causation, the court does not reach KPMG's other arguments in support of its motion for summary judgment.

---

[5] In fact, if the Trustee's own argument is to be believed, KPMG had an interest in maintaining a long-term relationship with Whittman-Hart; it is incredible for the Trustee to argue that KPMG should have known its actions would destroy Whittman-Hart, rendering it bankrupt. *See* Pl.'s Opp. 25 ("In early 2000, Whittman-Hart was an important client for KPMG. . . . KPMG thus had strong incentives to continue a relationship, both as auditor and as business advisor, with an entity that would be more than two times the size of Whittman-Hart. . . . KPMG lobbied to continue its profitable relationship with the company ***after*** the merger.") (emphasis in original).

### III. CONCLUSION

For the foregoing reasons, KPMG's motion for summary judgment is granted.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 19, 2007